Milligan, J.,
delivered the opinion of the Court.
On the 8th of October, 1860, the defendant, R. Y. Johnson, as Oashier of the Bank of America, drew two drafts on the Park Bank, of New York, each for $500, and both in the following language, viz:
“Bank oe America,
“State oe Tennessee,
“$500. QlarJcsviUe, November 8, ■ 1860.
“Pay to the order of James M. Jones, ($500,) five hundred dollars.
“To Park Bank,
“New York.
R. Y. Johnson, Oashier.”
*90 These drafts, by indorsement, were regularly passed to the Northern Bank of. Kentucky; and, on the 22d of November, 1860, duly presented for payment, demand made,’ and payment refused, and both protested for non-payment.
On the 15th of February, 1861, suit was brought on them, in the Circuit Court of Montgomery County, against “The Bank of America, of Tennessee,” the defendant, R. Y. Johnson, and James M. Jones, the in-dorser. The declaration following the writ, was against all the defendants; who, as the record shows on the trial, withdrew their plea; and judgment, on the 26th of September, 1865, as by confession, was jointly rendered against them.
On the 1st of January, 1866, the defendant in error, R. Y. Johnson, filed his petition in the Circuit Court, for a writ of error coram nobis, alleging, among other things, that he was in no way personally liable on the drafts; and, although he had been served with a process, he was under the belief, until after judgment was taken against him, that he was merely summoned as an officer of the bank, in order to bring the corporation into Court; and that the plea, as to him, was withdrawn without authority, and through mistake of the attorney of the bank, etc.
The writ of error coram nobis, was granted, and error assigned of record; to which a plea was filed, traversing the errors assigned, and issue joined thereon; which was tried by a jury of the county, and found in favor of Johnson. Judgment was pronounced on the verdict of the jury, recalling and revoking the original judgment as to Johnson.
*91 To reverse this judgment, the record has been filed for error.
All questions which might, perhaps very properly, arise on the proceedings for the writ of error coram, nolis, are, by agreement of counsel, waived, and the single question submitted for our determination, whether or not, the defendant, Johnson, is individually liable on the drafts to the plaintiffs, as holders?
It is insisted, that the defendant, Johnson, not only did not use the corporation name of the bank for which he assumed to act as Cashier, but that he transcended the scope of his authority as such, in drawing the drafts which constitute the foundation of this action, and thereby rendered himself personally liable to the holders.
The drafts appear to have been drawn at the “Bank of America,” when the technical name of the corporation, is the “Bank of America, of Tennessee.” Suit was brought against the bank in its charter name, to-wit: “The Bank of America, of Tennessee;” to which the corporation took no exceptions, and in that name suffered judgment to go against it, and it is too late now for either party to take advantage of any exceptions on that ground.
But the second error assigned, presents a more difficult and perplexing question. The charter provides, that: “All bills, bonds, notes, and every contract on behalf of the company, shall be signed by the President, and countersigned and attested by the Cashier of the company; and the funds of the company shall, in no wise, be held responsible for any contract or en *92 gagement whatever, unless the same shall be executed as aforesaid:” Acts of 1856, chap. 210, sec. 14, art. 8.
“It is admitted to be true,” says this Court, in the case of Neiffer vs. The Bank of Knoxville, “as a general proposition, that, where the charter of an incorporation prescribes the particular mode in which its contracts shall be made or authenticated, that mode must be pursued; for corporations, like natural persons, are, in general, bound only by the acts and contracts of their agents within the scope of their authority. And all restrictions upon the power of the agents or 'officers contained in the charter, every one dealing with the corporation is bound to notice. But, if no definite rule is to be found, either in the charter or by-laws of the institution, in regard to the manner and form in which its acts and contracts shall be evidenced, then, it seems general usage, and the course of business of similar institutions, is to govern; the officers will be presumed to have been invésted with the customary authority, and their acts, within the scope of such usage, practice, and course of business, will be binding on the institution, in favor of the third person having no knowledge to the contrary.”
Admitting, this to be the general rule of law, alike applicable to individuals and corporations, how are the provisions of this charter to be understood? It assumes to prescribe the particular mode in which its contracts are to be made; and, undoubtedly, all contracts intended to be comprehended within the provisions of the - charter before quoted, must, in order to bind the *93 corporation, be made in reasonable conformity thereto. But was it intended to comprehend the drawing and indorsing of bills of exchange, drafts, and checks, in the ordinary discharge of the duty of the Cashier? It is said that the Cashier of a bank, virtióte officii, is generally intrusted with the notes, securities, and other funds of the bank, and is held out to the world by the bank as its general agent, in the negotiation, management and disposal of them. Prima facie, therefore, from the very naturé of his office, and the objects and purposes of the bank, he must be deemed to have authority to transfer and indorse negotiable securities held by the bank, for its use, and in its behalf; and no special authority for this purpose is necessary to be proved. These are some of the general and necessary duties of the Cashier, as the executive officer of a banking association; and, “if any bank,” says Angelí & Ames on Corporations, section 300, “chooses to depart from this general course of business, it is certainly at liberty to do so; but in such case, it is incumbent on the bank to show that it has interposed a restriction, and that such restriction is known to those with whom it is in the habit of' doing business. A clause in a bank charter requiring the signature of the President and the counter signature of the Cashier, to any contract or engagement whatever, before the funds of the bank should be liable therefor, was construed, not to apply to or restrict the powers of the Cashier to draw and indorse bills. of exchange, drafts and checks in the ordinary discharge of his duties as Cashier.”
*94 In addition to this authority, which seems to be sustained by the cases of Merchants’ Bank vs. Central Bank, 1 Kelly (Ga.) R., 430; and Carey vs. McDougald, 7 Georgia R., 84; this question came directly before the Supreme Court of the United States, in which the same doctrine was recognized.
In the case of Mechanics’ Bank of Alexandria vs. Bank of Columbia, 5 Wheaton’s U. S. R., 326, almost the identical question was presented that is raised in this record. The charter of the' bank, in that case, contained a provision, that 4‘all bills, bonds, notes, and every other contract or engagement on behalf of the corporation, should be signed by the President and countersigned by the Cashier; and that the funds of the corporation should, in no case, be liable for any contract or engagement, unless the same should be signed and countersigned as aforesaid;” and the Court held, that this section did not apply, or extend to contracts and undertakings implied in law; and that the bank was liable for money advanced upon a check, made in the course of business, and signed by the Cashier only. So it seems clear, both upon reason and authority, as well as the general custom of banks, as shown in this record, that the Cashier of a bank, as its executive officer, through whom all the moneyed operations of the bank are transacted, may, virtute offieii, bind the funds of the bank in matters of contract springing out of his legitimate and ordinary duties as Cashier; and that the restrictions in the charter, requiring the signature of the President and counter-signature of the Cashier, do not *95 extend to and comprehend such contracts as the drawing and indorsing of bills of exchange, drafts and checks, which are implied by law as a part of the ordinary duties of the Cashier.
It follows, from this view of the case, that the defendant in this case, did not transcend the scope of his authority, as Cashier of the bank, or violate the spirit and meaning of its charter; and he is not, therefore, individually responsible for the drafts in controversy, to the holders.
Affirm the judgment.